UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

BEVERLY ZAKRE,

                    Plaintiff,                03 Civ. 257

     -against-                                OPINION

NORDDEUTSCHE LANDESBANK
GIROZENTRALE,

                    Defendant.

------------------------------------X



A P P E A R A N C E S:

          Attorneys for Plaintiff

          VLADECK, WALDMAN, ELIAS &
            ENGELHARD, P.C.
          1501 Broadway, Suite 800
          New York, NY  10036
          By:  Anne L. Clark, Esq.
               Karen Cacace, Esq.


          Attorneys for Defendant

          MCDERMOTT WILL & EMERY LLP
          340 Madison Avenue
          New York, NY  10017
          By:  Joel E. Cohen, Esq.
               Carolyn T. Schiff, Esq.
               Katherine D. Kale, Esq.

**Sweet, D.J.**

Defendant Norddeutsche Landesbank Girozentrale
("Nord/LB," the "Bank," or the "Defendant") has moved under
Rule 50(b), Fed. R. Civ. P., to set aside the punitive
damage award in favor of plaintiff Beverly Zakre ("Zakre"
or the "Plaintiff") and alternatively under Rule 59(a) and
(e), Fed. R. Civ. P., for a new trial or remittitur.

Zakre has also moved for attorneys' fees and
costs pursuant to Title VII, 42 U.S.C. § 2000e-5(k), and
the New York City Administrative Code, N.Y. City Admin.
Code § 8-502(f), and for reinstatement with pension credit,
and interest, pursuant to Fed. R. Civ. P. 59(e), and
federal, state and city law.

For the reasons set forth below, the motion to
set aside is denied, and the motion for a remittitur with
respect to punitive damages is granted. The motion for
attorneys' fees and costs is granted, and the motion for
reinstatement is denied.

1

## Prior Proceedings

On April 23, 2007, after a ten-day trial, a jury
found that the Bank discriminated against Zakre because of
her gender and retaliated against her because of her
opposition to unlawful employment actions, in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C.    §
2000e ("Title VII"); the New York State Human Rights Law,
N.Y. Exec. §§ 296-301 ("Executive Law"); and the
Administrative Code of the City of New York §§ 8-107-8-131
("City Law").  The jury awarded Zakre $1,348,971 in lost
wages and benefits, $100,000 for emotional distress, and
$2,500,000 in punitive damages.

On April 30, 2007, the Managing Clerk at
McDermott Will & Emery, counsel for Defendant, noted that
the electronic docket in this case reflected that judgment
had been entered by the Court on April 27, 2007.  The
judgment was entered on April 26, 2007.  Nord/LB filed this
motion on May 10, 2007, and on May 11, 2007, filed an
amended memorandum of law raising an additional argument.
The instant motion was heard and marked fully submitted on
June 6, 2007.

2

## The Standards under Rule 50 and Rule 59

A motion for judgment as a matter of law pursuant to Rule 50(b) is appropriately granted only when the Court determines that "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 120 (2d Cir. 1998). In connection with a 50(b) motion, "the trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir. 2001) (quoting Smith v. Lightening Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988)). "The court cannot assess the weight of conflicting evidencing, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." Id. Moreover:

> In making its evaluation, the court should 'review all the evidence in the record,' but 'it must disregard all evidence favorable to the moving party that the jury is not required to believe . . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving

3

party that is uncontradicted and unimpeached, at
least to the extent that the evidence comes from
disinterested witnesses.

Id. (emphasis in original, internal citations omitted)
(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133, 150-51 (2000)).

The standard for granting a new trial pursuant to
Rule 59, Fed. R. Civ. P., is less stringent than that for
judgment as a matter of law. See Katara v. D.E. Jones
Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987);
Bseirani v. Mahshie, 881 F. Supp. 778, 783 (N.D.N.Y. 1995),
aff'd, 107 F.3d 2 (2d Cir. 1997). On a motion for new
trial, the judge may grant a new trial even if there is
substantial evidence to support the jury's verdict. Song
v. Ives Laboratories, Inc., 957 F.2d 1041, 1047 (2d Cir.
1992). The court may weigh the evidence for itself without
viewing it in the light most favorable to the verdict
winner. See id.; Paper Corp. of the U.S. v. Schoeller
Technical Papers, Inc., 807 F. Supp. 337, 347 (S.D.N.Y.
1992). Still, a new trial may only be granted if "the
court is convinced that the jury has reached a seriously
erroneous result, or that the verdict is against the weight
of the evidence, making its enforcement a miscarriage of

4

justice." Lightning Bolt Prods., Inc., 861 F.2d at 370;

Taylor v. National R.R. Passenger Corp., 868 F. Supp. 479,

484 (E.D.N.Y. 1994). Moreover, "[w]here the resolution of

the issues depended on assessment of the credibility of the

witnesses, it is proper for the court to refrain from

setting aside the verdict and granting a new trial."

Piesco v. Koch, 12 F.3d 332, 345 (2d Cir. 1993) (citing

Metromedia Co. v. Fugazy, 983 F.2d 350, 361 (2d Cir. 1992),

cert. denied, 508 U.S. 952 (1993)).


        If a district court finds that a verdict is

excessive, it may order a new trial, order a new trial

limited to damages, or, under the practice of remittitur,

condition denial of a motion for a new trial on the

plaintiff's accepting damages in a reduced amount. See

Tingley Systems, Inc. v. Norse Systems, Inc., 49 F.3d 93,

96 (2d Cir. 1995) (citing Phelan v. Local 305 of the United

Ass'n of Journeymen and Apprentices of the Plumbing &

Pipefitting Indus., 973 F.2d 1050, 1064 (2d Cir. 1992),

cert. denied, 507 U.S.972 (1993)). However, it is not

among the powers of the trial court, where the jury has

awarded excessive damages, simply to reduce the damages

without offering the prevailing party the option of a new

                            5

trial. See id. (citing Vasbinder v. Scott, 976 F.2d 118, 122 (2d Cir. 1992)).

**The Rule 50(b) Motion is Timely**

Zakre has contended that this portion of the Nord/LB motion is untimely in that the Defendant raised its challenge to the back pay award on May 11, 2007, and raised only issues relating to the insufficiency of the evidence as to the failure to promote claim and as to pretext with respect to termination in its Rule 50(b) motion at the close of the Plaintiff's case. Zakre also noted that Nord/LB did not renew its 50(b) motion at the close of all evidence.

However, effective December 1, 2006, Fed. R. Civ. P. 50(b) was amended to delete the requirement that a Rule 50(a) motion for judgment as a matter of law made before the close of all the evidence must be renewed at the close of all the evidence. As explained in the 2006 Notes of the Advisory Committee:

This change responds to many decisions that have begun to move away from requiring a motion for judgment as a matter of law at the literal close of all the evidence. Although the requirement has been clearly established for several decades,

6

lawyers continue to overlook it. The courts are
slowly working away from the formal requirement.
The amendment establishes the functional approach
that courts have been unable to reach under the
present rule and makes practice more consistent
and predictable.

Fed. R. Civ. P. 50 Advisory Committee Notes (2006).

Nord/LB challenged the sufficiency of the
evidence to support an award on liability, stating that
there was no evidence that Defendant was motivated by
improper animus. Trial Tr. 1081; Cruz v. Local Union No. 3
of the IBEW, 34 F.3d 1148, 1155 (2d Cir. 1994) (explaining
that appellant could have challenged the sufficiency of the
evidence for a damage award if not the award itself)
(citing W.W.W. Pharm. Co. v. Gillette Col., 984 F.2d 567,
570 (2d Cir. 1993) (explaining appellee moved for judgment
as a matter of law in the district court "on the ground
that there was no legally sufficient basis for a reasonable
jury to find for the plaintiff[-appellant]")). Plaintiff
concedes that Defendant moved for judgment as a matter of
law at the close of Plaintiff's case.

The instant motion was timely and the grounds
upon which it was based are appropriate for consideration.

## Punitive Damages Were Appropriate

Nord/LB has contended that the punitive damage award was against the weight of the evidence. An award of punitive damages is warranted in a Title VII action where an employer discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In Kolstad v. Am. Dental Ass'n, 527 U.S. 526 (1999), the Supreme Court explained that the terms "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law. Id. at 535-36. The Court stated that to be liable for punitive damages under Section 1981a, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Id. at 536. "[A] positive element of conscious wrongdoing is always required." Id. at 538 (internal quotation marks and citation omitted).

An employer does not have the requisite state of mind if it "discriminated with the distinct belief that its [alleged] discrimination is lawful," even if that belief is erroneous. Id. at 537. According to Nord/LB, the Second

Circuit has explicitly held that where the employer acts pursuant to advice that its action is consistent with the law, an award of punitive damages cannot stand under Kolstad. Farias v. Instructional Sys. Inc., 259 F.3d 91, 102 (2d Cir. 2001); see also Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 236 (2d Cir. 2000).

In Farias, the Second Circuit affirmed the district court's denial of punitive damages as a matter of law where the defendant had consulted with counsel before engaging in conduct found to violate Title VII. 259 F.3d at 101-02. The Court held that "whether or not the advice was appropriate, action taken pursuant to advice that the action is consistent with the law is insufficient to support an award of punitive damages under the standard articulated in Kolstad." Id. at 102. Similarly, in Weissman, the Second Circuit affirmed the district court's determination that punitive damages were barred as a matter of law where, inter alia, the defendant had consulted with counsel before engaging in conduct violative of Title VII. 214 F.3d at 235-36.

Here, it was established that Nord/LB began consulting with counsel immediately upon receipt of the

9

January 7, 2002, lawyer's letter on Zakre's behalf alleging
discrimination, and did so continuously throughout the
entire duration of this lawsuit. Moreover, Nord/LB did not
terminate Zakre until it consulted with counsel.

The Supreme Court in Kolstad recognized limited
situations in which intentional discrimination does not
give rise to punitive damages: (1) where the employer is
unaware of the federal prohibition on
discrimination/retaliation; or (2) where the employer
discriminates with the belief that its discrimination was
lawful, either because the "underlying theory of
discrimination may be novel or otherwise poorly recognized,
or an employer may reasonably believe that its
discrimination satisfies a bona fide occupational
qualification defense or other statutory exception to
liability." Id. at 536-37.

Here, Nord/LB's decisionmakers testified that
they knew that discrimination and retaliation were illegal.
See Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376,
385 (2d Cir. 2001) (finding that acknowledged training in
"equal opportunity" permitted an inference of the requisite
mental state for punitive damages); Parrish v. Sollecito,

280 F. Supp. 2d 145, 152-53 (S.D.N.Y. 2003) (finding that
defendant's attempt to institute a sexual harassment
policy, as well as prior experience with legal counsel
regarding a sexual harassment claim, constituted sufficient
evidence to support a jury award of punitive damages);
Kuper v. Empire Blue Cross & Blue Shield, No. 99 Civ. 1190,
2003 WL 359462, at *5 (S.D.N.Y. Feb. 18, 2003) (upholding a
punitive damage award based upon, inter alia, a decision-
maker's testimony that she was aware of laws prohibiting
discrimination based on disability). There is no claim
that the failure to promote Zakre, the creation of a
hostile work environment, or the firing of Zakre met any
statutory exceptions or involved any novel or unresolved
legal theories. See Greenbaum v. Handelsbanken, N.Y., 67
F. Supp. 2d 228, 262-63 (S.D.N.Y. 1999) (Sotomayor, C.J.,
sitting by designation) (noting that evidence supporting
liability may also support punitive damages, especially
where "the illicit activity is an unexceptional and
paradigmatic type of discrimination, one that is commonly
recognized as prohibited").

Here, the reliance on the advice of counsel,
asserted by Nord/LB as precluding punitive damages, does
not negate the requisite intent. In Farias, the defendant,

11

on advice of counsel, believed that offering severance
conditioned on a release of all claims to a person who
filed an EEOC charge after her employment was terminated,
but before severance was offered, would be viewed as
coercive. The advice given for the isolated and somewhat
unusual incident was a defense to punitive damages, but not
liability. 259 F.3d 102. In Weissman, the court did not
directly address whether consulting counsel need
necessarily be considered dispositive, as the plaintiff
conceded that discussions with counsel sufficed to
eliminate the possibility that the defendant was acting "in
reckless disregard" for the plaintiff's rights. 214 F.3d
at 235-36.

In both Farias and Weissman, the defendants
disclosed the advice of counsel. Farias, 259 F.3d at 96;
Weissman, 214 F.3d at 228. Here, while there was testimony
that Nord/LB consulted with counsel or had documents
reviewed by counsel, there is no evidence as to what
counsel told the Bank. In Greenbaum, 67 F. Supp. 2d at
262-64, the court rejected an "advice of counsel" defense,
concluding that consultation with counsel did not establish
as a matter of law that the defendant attempted to comply
with antidiscrimination laws. Where there are no novel

12

legal issues or conflicting legal obligations, consultation
with counsel may merely demonstrate that a defendant was
aware of laws against discrimination and retaliation. Id.
(citing Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 467
(2d Cir. 1989)).

Nord/LB has also contended that punitive damages
must be vacated because there was not sufficient evidence
of the requisite intent on the part of Juergen Koesters
("Koesters"), who, according to Nord/LB, was the decision-
maker with respect to the denial of promotion and the
termination.

Initially, in denying defendant's motion for a
directed verdict on liability, the Court determined that
there was evidence from which the jury could have found
that Jens Westrick ("Westrick"), the general manager of the
New York branch, was involved in both selecting Alessandro
Gajano ("Gajano") and rejecting Zakre for the position of
Treasurer. There was testimony relating to bias exhibited
by Westrick.

There was also evidence that Koesters displayed
biased attitudes, such as being able to think of only two

13

women he had promoted in his current and prior jobs, his statements that Aimee Srebnik's ("Srebnik") complaints that Gajano had discriminated against Srebnik at her last job were "not serious" and were no reason to question giving Gajano the job of Treasurer, his negative response when Maria Spinelli ("Spinelli") complained of sex discrimination in promotions and of Gajano's abusive conduct, and his instructions to Gajano to be nice to Andrea Rudzwick ("Rudzwick") in order to use her against Zakre.

In addition, the jury found a discriminatory and retaliatory hostile work environment. There was testimony that Gajano was the prime player in creating such an environment and that Westrick continued to be involved. There was also conflicting testimony with respect to the firing of Zakre, namely that, according to Koesters, Gajano decided to file her and, according to Gajano, Koesters made the decision. See Chalfant v. Titan Distribution, Inc., 475 F.3d 982, 991-92 (8th Cir. 2007) (finding punitive damages appropriate where, inter alia, no one took responsibility for employment decision and instead each person denied involvement, as such conduct could show that

14

defendant was aware it may have been acting in violation of
federal law).

Sufficient evidence has been adduced to warrant
the jury's award of punitive damages.

## The Punitive Damage Award Was Excessive

A district court may refuse to uphold a punitive
damage award when the amount is "so high as to shock the
judicial conscience and constitute a denial of justice."
Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996) (quoting
Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc.,
850 F.2d 876, 883 (2d Cir. 1988)) (internal quotation marks
and citation omitted); Scala v. Moore McCormack Lines,
Inc., 985 F.2d 680, 683 (2d Cir. 1993).  In reviewing a
punitive damages award, the court must bear in mind its
purpose, which is "to punish the defendant and to deter him
and others from similar conduct in the future."  Id.
(citing Vasbinder, 976 F.2d at 121).  A punitive damages
award will not be upheld where it is so "grossly excessive"
that it "furthers no legitimate purpose and constitutes an
arbitrary deprivation of property."  Mody v. General
Electric Co., No. 04 Civ. 358 (WWE), Slip. Op., 2007 WL

15

3025289, at *6 (D.C.T. Oct. 15, 2007) (citing State Farm
Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003)).

In BMW of North America Inc. v. Gore, 517 U.S.
559 (1996), the Supreme Court set forth three categories of
factors to be considered in assessing the validity of a
punitive damage award.  These factors include: (1) the
degree of reprehensibility of the defendant's misconduct;
(2) the disparity between the actual or potential harm
suffered by the plaintiff and the punitive damages award;
and (3) the difference between the punitive damages awarded
by the jury and the civil penalties authorized or imposed
in comparable cases.  Gore, 517 U.S. at 574-75; see also
Lee, 101 F.3d at 809.

*Reprehensibility of Defendant's Conduct*

Of the Gore factors, the Supreme Court identified
the first, degree of reprehensibility, as "[p]erhaps the
most important indicium of reasonableness of a punitive
damages award." Gore, 517 U.S. at 575.  The Court
enumerated five aggravating factors for courts to consider
when evaluating reprehensibility:  (1) whether the harm
caused was physical as opposed to economic; (2) whether the

tortious conduct evinced an indifference to or a reckless
disregard of the health or safety of others; (3) whether
the target of the conduct had financial vulnerability; (4)
whether the conduct involved repeated actions or was an
isolated incident; and (5) whether harm was the result of
intentional malice, trickery, or deceit, or mere accident.
State Farm, 538 U.S. at 419.

With respect to the first and second factors,
Zakre did not suffer any physical injury as a result of
Nord/LB's alleged wrongdoing, and Nord/LB did not engage in
any conduct that threatened the health or safety of others.

With respect to the third factor, Zakre testified
that after her termination she looked into purchasing
several businesses with asking prices ranging from $460,000
to $750,000 and worked for seven months at a start-up hedge
fund for no salary or benefits. In addition, she testified
that she was offered a separation package of ten months
salary (approximately $120,000) in connection with her
termination, which she declined. At the time Zakre was
terminated, she had one child in college and another
approaching college, her husband had retired, and she was
the sole wage earner for the family.

17

As to the fourth factor, there was evidence of
discriminatory conduct over time affecting Zakre from the
time she was denied the Treasurer's post until her
termination almost four years later. In addition, there
was also extensive evidence of discrimination against women
generally at Nord/LB. Complaints about discrimination and
suggestions regarding training on equal employment
opportunity laws were dismissed.

As to the fifth factor, intentional malice or
deceit as opposed to accident, there was evidence that
Koesters gave Zakre conflicting statements concerning the
selection of Gajano for Treasurer, that Rudzwick was used
as a pawn against Zakre, that Zakre was treated differently
from other employees seeking verification for a mortgage,
that she was criticized unfairly after arrival of the
letter from her counsel, that her career prospects and
responsibilities were limited, and that she was demoted
from Deputy Treasurer and top employee in Capital Markets.
Westrick's direction to Gajano to put pressure on Zakre,
Spinelli, and Srebnik, and his direction to listen in on
Zakre's telephone calls, do not evidence accident.

*Disparity Between Punitive Damages Award and Harm Suffered*

Although there is no "bright-line ratio which a
punitive damages award cannot exceed," the Supreme Court
has held that "[s]ingle-digit multipliers are more likely
to comport with due process, while still achieving the
State's goals of deterrence and retribution." State Farm,
538 U.S. at 425. Furthermore, "[w]hen compensatory damages
are substantial, then a lesser ratio, perhaps only equal to
compensatory damages, can reach the outermost limit of the
due process guarantee." Id. Of course, "[t]he precise
award in any case . . . must be based upon the facts and
circumstances of the defendant's conduct and the harm to
the plaintiff." Id.

Here, the ratio of punitive to compensatory
damages awarded by the jury is less than 2:1. However, the
compensatory damages award was substantial, see Watson v.
E.S. Sutton, Inc., No. 02 Civ. 2739 (KMW), 2005 U.S. Dist.
LEXIS 31578, at *55 (citing State Farm, 538 U.S. at 425,
for the proposition that a $1 million compensatory damages
award is "substantial"), indicating that a reduction of the
punitive damage award, if warranted by the circumstances of
the case, would not be inappropriate.

*Disparity Between Punitive Damages and Civil Penalties*
*Imposed in Comparable Cases*

The maximum damages award available under Title
VII is $300,000. See 42 U.S.C. §1981a(b)(3)(d). The New
York Human Rights law prohibits the imposition of punitive
damages altogether in an employment discrimination action.
N.Y. Exec. Law § 297(9). The City Law permits punitive
damages, without a limitation on the maximum amount, in
employment discrimination cases. N.Y. City Admin. Code §
8-502(a). As only the City Law allows for punitive damages
above $300,000, "most 'comparable cases' (that is, New York
State and Title VII discrimination claims) have allowed
punitive damages of only $ 300,000 or less." Watson v.
E.S. Sutton, Inc., No. 02 Civ. 2739 (KMW), 2005 U.S. Dist.
LEXIS 31578, at *56 (citing Luciano v. Olsten Corp., 110
F.3d 210, 222 (2d Cir. 1997)); cf. Thomas v. iStar
Financial, Inc., No. 05 Civ. 606 (VM), 2007 U.S. Dist.
LEXIS 67856, at *1 (S.D.N.Y. Sept. 7, 2007) ("[T]he federal
cap . . . provides guidance on what is considered an
appropriate civil penalty for comparable misconduct.")
(citations omitted).

Because Title VII has a cap on punitive damages,
and the Executive Law does not provide for punitive
damages, there is not a large pool of relevant cases, those
with punitive damages awards under the City Law.
Greenbaum, 67 F. Supp. 2d at 268. A reviewing court may
look not only at the caps under Title VII, but also, for
example, at the liquidated damages provision of the Age
Discrimination in Employment Act, 29 U.S.C. §626(b), or the
unlimited punitive damages under the Fair Housing Act, 42
U.S.C. §3613(c). See id. at 271.

Comparison to punitive damage awards in
comparable cases indicates that a reduction of the punitive
damages award in this case is appropriate. For example, in
Watson, 2005 U.S. Dist. LEXIS 31578, in which the defendant
was found liable for retaliation under Title VII, the
Executive Law, and the City Law, the court reduced a
punitive damages award from $2.5 million to $717,000
(approximately 50 percent of the compensatory damages
award), noting that although such an award was "less than
the maximum than would be constitutionally permissible," it
was "within the range within range of the awards given in
comparable cases brought under only federal and state law,
but still reflect[ed] the additional damages available

under the City code" and was "substantial enough to deter, while not being unduly burdensome." Id. at *57.

As the Second Circuit suggested in Greenbaum, it is useful to compare damages awards not in absolute terms, but by reference to the Gore factors. Greenbaum, 67 F. Supp. 2d at 271. In Bell v. Helmsley, Index No. 111085/01, 2003 WL 1453108 (March 4, 2003), employing a Gore analysis, a New York court reduced a punitive damages award of $10 million to $500,000. The Bell court noted that in McIntyre v. Manhattan Ford, 682 N.Y.S.2d 167 (Sup. Ct. 1998), a case involving "far more egregious" behavior than involved in Bell, including physical assault, the court "capped punitive damages at $1.5 million." Bell, 2003 WL 1453108, at *5. In Thomas, 2007 U.S. Dist. LEXIS 67856, cited by Nord/LB, the court reduced a punitive damages award under the City law from $1.6 million to $190,000, where the plaintiff had been awarded $190,000 in back pay and the court stated that while there was "certainly sufficient evidence of reprehensible conduct to warrant a punitive damage award, the reprehensibility should not be overstated." Id. at * 24.

In opposition to the motion for remittitur, Zakre points to Mody v. General Electric Co., No. 04 Civ. 358 (WWE), Slip. Op., 2007 WL 3025289, at *6 (D.C.T. Oct. 15, 2007), in which the court awarded $5 million in punitive damages, reducing the jury's initial award of $10 million. The Mody court noted that the Title VII and ADEA damages caps "weigh[ed] in favor of reducing the jury's punitive damages award," and stated that in light of its Gore analysis, as well as the deterrent and punitive purposes of the award, a $5 million award was appropriate, although "in the upper range on the constitutionally-permitted punitive damages. Id. at *8.

Zakre also cites Gallegos v. Elite Model Mgmt. Corp., 807 N.Y.S.2d 44 (Sup. Ct. 2004), which concerned an asthmatic plaintiff who was forced to sit in a room among heavy smokers in violation of anti-smoking laws, which caused her to become extremely physically ill, and who was then terminated for complaining. In Gallegos, the court upheld a punitive damages award of approximately $2.6 million, in addition to $1.1 million in compensatory damages, under the New York State Executive Law and the City Law.

Unlike the instant case, both Mody and Gallegos
involved behavior demonstrating disregard for the health of
the plaintiffs. In Mody, the court noted that a reduction
in punitive damages was warranted, in part, because the
case involved no violence or indifference to the health and
safety of a broad scope of individuals. However, in
support of the $5 million ultimately awarded, the court
noted that the defendant's actions resulted in the
plaintiff's "health-threatening" stress and that the
defendant's conduct was made "more reprehensible by the
fact that [he] was aware that plaintiff required dialysis."
Mody, 2007 WL 3025289, at * 8.

In view of the Gore factors considered above, the
remedial purpose of the City Law, punitive damage awards in
comparable cases, and the roughly $1.5 million dollar award
for compensatory damages, a punitive damage award in the
amount of $600,000 is appropriate and a remittitur to that
amount is directed. If Zakre does not accept the
remittitur, the punitive damage award will be vacated and a
new trial will be conducted on that limited issue. See
Vasbinder, 976 F.2d 118, 123 (2d Cir. 1992).

## The Back Pay Award is Supported by the Evidence

Nord/LB has challenged the back pay award on a variety of grounds. Nord/LB has contended that the salary of Gajano was an improper basis for consideration, that Zakre's prior salary was controlling, that the Treasurer's position was eliminated in 2006, and that mathematical miscalculations were presented to the jury by Zakre.

Under the governing standard for review of damages, cited by Zakre, "[a] jury's determination of damages must stand unless, after according substantial deference to the jury's findings of fact, the court concludes that the amount awarded is so high as to shock the judicial conscience and constitute a denial of justice." Dailey v. Societe Generale, 915 F.Supp. 1315, 1324 (S.D.N.Y. 1996), aff'd in relevant part, 108 F.3d 451 (2d Cir. 1997) (quoting Blisset v. Coughlin, 66 F.3d 531, 536 (2d Cir. 1995) (citations omitted)). Under Title VII, any doubts in calculating lost compensation should not benefit the defendant. See Malarkey v. Texaco, Inc., 794 F.Supp. 1237, 1243-44 (S.D.N.Y. 1992), aff'd, 983 F.2d 1204 (2d Cir. 1993); Koyen v. Consolidated Edison Co., 560 F.Supp. 1161, 1169 (S.D.N.Y. 1983).

However, Nord/LB asserts that while back pay remedy under Title VII "is intended to make the victims of unlawful discrimination whole," Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975), it should not result in a plaintiff receiving a windfall. See Iannone v. Frederic R. Harris, Inc., 941 F.Supp. 403, 412 (S.D.N.Y. 1996) (citation omitted). According to Nord/LB, the jury's award of $ 1,348,971 in back pay for Zakre's failure to be promoted to Treasurer in 2001 and her termination in 2005 is grossly excessive.

The use of the salary of Gajano, who was selected as Treasurer, for the back pay calculation was appropriate. This basis has been used in other cases. See, e.g., Malarkey, 794 F.Supp. at 1242; EEOC v. Delight Wholesale Co., 973 F.2d 664, 668-70 (8th Cir. 1992); Stalworth v. Shuler, 777 F.2d 1431, 1434-35 (11th Cir. 1985). The testimony did not indicate that Nord/LB had a standard practice for setting compensation, since some new employees were paid more to attract them away from current employer and, in other instances, long-term employees were paid more than recent arrivals and some employees took pay cuts to join Nord/LB. The evidence on these practices was all

presented to the jury and provided a rational basis upon
which to calculate back pay for Zakre.

There was also extensive evidence that women,
including Zakre, were paid a lower wage. The contention of
Nord/LB, essentially to project plaintiff's discriminatory
wages forward, is contrary to the purposes of Title VII.

The elimination of the post of Treasurer after
Zakre's termination did not establish that Zakre would have
been terminated given her work in Capital Markets. See
Banks v. Travelers Cos., 180 F.3d 358, 363-64 (2d Cir.
1999) (holding that trial court erred in instructing jury
that it could not award lost wages for the period after
plaintiff's position was eliminated). It is relevant that
Kevin Berger ("Berger") was asked to stay on after
tendering his resignation, and was replaced by Sam
Weinstock ("Weinstock"), who, at the time of trial, was
responsible for Capital Markets with the title of Senior
Vice President. The compensation paid to Berger, Weinstock
and Robert Fakhoury was also evidence relevant to the back
pay determination.

Nord/LB has also challenged the testimony of
Antonio Fernandez ("Fernandez"). Fernandez made basic
mathematical calculations comparing Zakre's compensation to
that of Gajano based on Gajano's average raises. It was
reasonable to project total compensation for Gajano for
2006, as his actual compensation did not accurately reflect
what someone who remained employed would have received.
Gajano was terminated in January 2006 and was paid only his
base pay under his contract and did not receive any
bonuses. Nord/LB received the damages charts prepared by
Fernandez before trial, including the 15.06% raise figure,
and at no time before or during trial raised the alleged
mathematical error or cross-examined Fernandez on it, or
argued it to the jury. Nord/LB did not present to the jury
any of the calculations it now has contended are
inappropriate.

The jury's award has sufficient support in the
record.

## **The Compensatory Damages Award is Supported by the Evidence**

The jury award of $100,000 to compensate
plaintiff for the emotional distress she suffered as a

28

result of the Bank's discrimination and retaliation has also been challenged by Nord/LB. However, the award does not "shock the judicial conscience and constitute a denial of justice." See O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988) (citing Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978)). "Reference to other awards in similar cases is appropriate," Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990) (citation omitted), but courts must take care not to limit their review too narrowly. See id. at 186-87 (finding, in reversing remittitur and reinstating $650,000 in compensatory damages, that that district court should not have limited its review to Section 1983 cases).

To recover compensatory damages, a plaintiff need not proffer expert testimony and "[m]ental injury may be proved by the [plaintiff's] own testimony, corroborated by reference to the circumstances of the alleged misconduct." New York City Transit Auth. v. State Div. of Human Rights, 78 N.Y.2d 207, 216 (1991). Moreover, as the New York Court of Appeals has stated, "recovery should not be based solely on common-law strictures as would be applied in determining liability for a tort. Recovery here, instead, is based on a statute which effectuates a State policy against

discrimination." Batavia Lodge No. 196 v. New York State
Div. of Human Rights, 35 N.Y.2d 143, 145 (1974).

When questioned about the effects of not
receiving the promotion to Treasurer in 2001, Zakre
testified: "I was depressed. I had difficulty sleeping.
I was very tense about going to work." Trial Tr. 192. She
also testified that "I became pretty short with [my family]
in terms of I had less patience than I had in the past . .
. ." Trial Tr. 192-93. When asked about the emotional
effects due to the harassment she suffered after 2001,
Zakre testified that in 2003, for the first time in her
life, she sought treatment from a psychologist. She went
to the psychologist because she "needed someplace to go to
express how [she] was feeling and start to deal with the
stress that [she] was under." Trial Tr. 194. Plaintiff
continued to receive treatment through the date of the
trial. Zakre testified that after she was fired by
Nord/LB, she was humiliated, and it was difficult for her
to explain the firing to people, including her family.

Zakre's husband testified that after she did not
receive the promotion to Treasurer in 2001, "[s]he was
upset, a little bit short-tempered . . . ." Trial Tr. 826.

30

Mr. Zakre also testified that from 2002 through 2005, when

Zakre was subjected to harassment, she "was a little more

combative towards us" and he suggested she see a therapist

to work through the stress she was under. Trial Tr. 827.

Spinelli testified that she observed that as a result of

Gajano's treatment of Zakre, Zakre "lost a lot of her

spirit, her morale." Trial Tr. 886. Rudzwick testified

that on one occasion she observed that Zakre was so upset

by Gajano's treatment that she was "shaking." Trial Tr.

985. Mr. Zakre also testified that after plaintiff was

fired, she was humiliated and embarrassed, and that she

"didn't want to do things that we had normally done, go to

the theater, go out with friends." Trial Tr. 827-28.


This evidence is sufficient to substantiate the

jury verdict of $100,000 in emotional distress damages.


In 2004, the Second Circuit noted that "New York

cases vary widely in the amount of damages awarded for

mental anguish." Meacham v. Knolls Atomic Power

Laboratory, 381 F.3d 56, 77-78 (2d Cir. 2004) (upholding

district court award of $125,000 in emotional distress for

plaintiffs that had "no proof other than testimony

establishing shock, nightmares, sleeplessness, humiliation,

and other subjective distress" and $175,000 where "either physical sequelae or professional treatment was established"), vacated on other grounds, KAPL, Inc. v. Meacham, 544 U.S. 957 (2005). In discussing the range of amounts awarded, the court cited several New York cases upholding "awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment." Id. at 78. In Osorio v. Source Enterprises, Inc., No. 05 Civ. 10029 (JSR), 2007 WL 683985, at *5 (S.D.N.Y. March 2, 2007), a court in this district upheld a compensatory damages award of $4,000,000 in an employment discrimination case, based on the plaintiff's emotional distress and damage to her reputation. See also Patterson v. Balasmico, 440 F.3d 104, 119-120 (2d Cir. 2006) (affirming district court's refusal to reduce $100,000 award for claim of emotional distress in employment discrimination case where award was supported only by plaintiff's testimony and plaintiff did not seek medical treatment); Quinn v. Nassau County Police Dep't, 53 F. Supp. 2d 347, 362-63 (E.D.N.Y. 1999) (upholding a $250,000 emotional distress award in employment discrimination case where plaintiff did not seek counseling until after consulting with an attorney about his case); Broome v. Biondi, 17 F. Supp. 2d 211, 223-26 (S.D.N.Y.

1997) (noting that "large awards have been upheld without signs of tangible harm or medical testimony" and upholding awards of $114,000 to each plaintiff in a housing discrimination case absent evidence of medical treatment).

The jury award for compensatory damages is sustained as within a reasonable range and supported by the evidence.

## Plaintiff's Motion for Attorneys' Fees and Costs is Granted and Motion for Reinstatement is Denied

Zakre has moved for attorneys' fees and costs pursuant to Title VII, 42 U.S.C. § 2000e-5(k), and the City Law, N.Y. City Admin. Code § 8-502(f). Zakre has also moved pursuant to Fed. R. Civ. P. 59(e), and federal, state, and city law, for reinstatement with pension credit and interest.

The parties have submitted their now customary careful and thorough briefing and the issues remaining are the appropriate rate for pre-judgment interest on the back pay award, the amount of Zakre's supplemental request for attorneys' fees, and reinstatement of Zakre.

*Prejudgment at the Federal Rate is Appropriate*

Courts in this Circuit considering mixed federal and state law judgments in which back pay is awarded have applied the rate set forth in 28 U.S.C. § 1961(a), i.e., the federal judgment rate and not the New York State rate. See, e.g., Cioffi v. New York Cmty. Bank, 465 F. Supp. 2d 202, 222 (E.D.N.Y. 2006) (applying § 1961(a) to interest on back pay award for violations under Title VII and the New York State Human Rights Law ("NYSHRL") and rejecting plaintiff's argument that the New York State rate of 9% should apply); James v. AMTRAK, No. 02 Civ. 3915 (RJH)(AJP), 2005 U.S. Dist. LEXIS 5401, at *71-73 (S.D.N.Y. Mar. 30, 2005) (same, collecting cases).

Because this award was made both under Title VII and the state and city laws, rather than as a supplemental claim as in Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 90 (2d Cir. 1998), the appropriate reference is to 28 U.S.C. § 1961, the current federal treasury rate. In addition, the interest must be compounded. Salupaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 145 (2d Cir. 1993) ("Given that the

purpose of back pay is to make the plaintiff whole, it can
only be achieved if interest is compounded.").

*Supplemental Fees are Appropriate*

As to the application for Supplemental Attorneys
Fees, Zakre has satisfactorily met the objections posed by
Nord/LB.  The attorney time and disbursements were in fact
billed to Zakre.  Furthermore, the explanations of time
spent cite-checking, opposing the Nord/LB post-trial
motions, and researching reinstatement and punitive damages
appear to be reasonable, and are in line with awards for
post-trial attorney's fees in comparable cases.  See, e.g.,
Bridges v. Eastman Kodak Co., No 91. Civ. 7985 (RLC), 1996
WL 47304, at *10 (S.D.N.Y. Feb. 6, 1996) (approving fees
for 51 hours spent defending attorneys' fees application,
in addition to time spent on preparing the original
application).

*Reinstatement is Denied*

While Zakre correctly notes that courts in this
district have "repeatedly emphasized the importance of
equitable relief in employment cases," Reiter v. MTA New

35

York City Trans. Auth., 457 F.3d 224, 230 (2d Cir. 2006),

in the instant case, reinstatement is not feasible. As

Nord/LB states, reinstatement may be denied where the

plaintiff's employment term would have already ended by the

time of judgment, Banks, 180 F.3d at 365 (citation

omitted), where reinstatement would displace an innocent

third party, see EEOC v. Century Broad Corp., 957 F.2d

1446, 1463 (7th Cir. 1992), or "where there employer-

employee relationship may have been irreparably damaged,"

Kirsch v. Fleet St. Ltd., 148 F. 2d 149, 169 (2d Cir. 1998)

(internal quotation marks and citation omitted).

Here, Nord/LB asserts that the position of

Treasurer was eliminated in 2006, therefore, even absent

the events giving rise to this litigation, Zakre would have

been terminated by the date of judgment. The Bank also

states that her former duties have been assumed by another

employee, leaving no position available into which to

reinstate her.

In the instant case, reinstatement is not

feasible, given the damaged relationship between the

parties. This litigation has been ongoing for over six

years, and, although some of the individuals who were

actively involved are no longer employed by Nord/LB, many others still are, including Kosters, Bruno Mejean, Stefanie Scholz, Stephanie Hoevermann, and Laura Barcia.

In addition, it is relevant that as the Head of Capital Markets at Nord/LB, Zakre managed a substantial portfolio. In Greenbaum, 979 F. Supp. 973 at 987, a case involving gender-based employment discrimination and retaliation, the court stated that "given the highly sensitive nature of plaintiff's prospective position-where she would be dealing directly not only with defendant's clients, but also with vast amounts of their wealth-it would be unwise to grant reinstatement as an equitable remedy." In reaching this conclusion, the court quoted the Second Circuit in EEOC v. Kallir, Philips, Ross, Inc., 420 F. Supp. 919, 926-27 (S.D.N.Y. 1976), aff'd, 559 F.2d 1203 (2d Cir. 1977):

> [T]he job from which plaintiff was discharged required a close working relationship between plaintiff and top executives of defendant. It also involved frequent personal contact with defendant's clients, with plaintiff acting as defendant's representative. Lack of complete trust and confidence between plaintiff and defendant could lead to misunderstanding, misrepresentations and mistakes, and could seriously damage the defendant's relationship with its clients. The situation here is quite

> unlike that presented when reinstatement is
> sought for an assembly line or clerical worker,
> or even for an executive whose job is not as
> sensitive for his employer's interests as is
> plaintiff's job here. The Court is convinced that
> after three and a half years of bitter litigation
> the necessary trust and confidence can never
> exist between plaintiff and defendant. To order
> reinstatement on the facts of this case would
> merely be to sow the seeds of future litigation,
> and would unduly burden the defendant.

Furthermore, Zakre's damages award is sufficient
to fully compensate her, making reinstatement or other
equitable relief unnecessary. See, e.g., Barbano v.
Madison County, 922 F.2d 139, 146-47 (2d Cir. 1990)
(finding no abuse of discretion in trial court's denial of
reinstatement and conclusion that plaintiff was made whole
by award of back pay of eight and one-half years,
prejudgment interest, and attorneys' fees); Greenbaum v.
Svenska Handelsbanken, 979 F. Supp. 973, 987 (S.D.N.Y.
1997) (finding both that there was too much animosity
between the parties to make reinstatement feasible and that
reinstatement, in addition to the back pay already awarded,
would constitute a windfall to the plaintiff); McIntosh v.
Irving Trust Co., 873 F. Supp. 872, 879 (S.D.N.Y. 1995)
(holding that reinstatement would in excess of relief
needed to make plaintiff whole where plaintiff had been

awarded many years back pay, including prejudgment interest).

## Conclusion

The motion to set aside the jury verdict with respect to the punitive damages, back pay, and compensatory damages is denied and the motion for a remittitur is granted to reduce the punitive damages award to $600,000. The motion for attorneys' fees and costs is granted, and the motion for reinstatement is denied.

It is so ordered.

**New York, N.Y.**
**February    7    , 2008**

ROBERT W. SWEET
U.S.D.J.

39